**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

**GLORIA RODRIGUEZ, as Executrix of**
**the Estate of Yolanda C. Rodriguez,**
**deceased,**

                                **Plaintiff,**

              -against-

**PETER MUBANDA, et al.,**

                            **Defendants.**

-------------------------------------------------------------------x

                                    **REPORT AND**
                                  **RECOMMENDATION**

                                  **02-CV-3819 (NG)**

**ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:**

      Currently pending before this Court, on a referral from the Honorable Nina Gershon, is plaintiff's motion for a default judgment and an award of damages against defendants Peter Mubanda ("Mubanda") and Performance Financial, LLC ("PF"). For the reasons that follow, this Court recommends that the motion be granted with respect to certain claims only and that plaintiff be awarded $40,000 in damages plus prejudgment interest.

## I. **BACKGROUND**[1]

### A. **Factual History**

      This action is brought by Gloria Rodriguez ("Gloria") in her capacity as executrix of the estate of Yolanda C. Rodriguez ("Yolanda C.'s Estate"). Gloria is a daughter of Yolanda C. Rodriguez ("Yolanda C.") and Andres Rodriguez ("Andres") (collectively, "the

---

[1] The factual background contained herein is drawn from plaintiff's Complaint ("Compl."); the Supplemental Supporting Affirmation of Joseph A. Milligan, Esq., counsel for plaintiff (hereinafter, "Inquest Submission") and supporting affidavits and exhibits attached thereto; and the Second Supplemental Supporting Affirmation of Joseph A. Milligan, Esq. ("Milligan 2d Suppl. Aff.") and exhibits attached thereto.

Rodriguezes"), both of whom were deceased at the time this lawsuit commenced. The

Complaint seeks damages for various acts of mismanagement of investment accounts held by

Yolanda C. and Andres at two brokerage firms, Merrill Lynch, Pierce, Fenner & Smith, Inc.

("Merrill Lynch") and Charles Schwab & Co., Inc. ("Schwab").

Beginning in the early 1990s, the Rodriguezes jointly held investment accounts[2] at

Merrill Lynch that were managed by defendant Mubanda, a financial consultant. See Compl.

at ¶¶ 17, 25. Mubanda is alleged to have conducted some or all of his investment activities,

with respect to these accounts, as an agent of PF, a company he co-owned with his wife,

Valerie Luther, a/k/a Valerie Mubanda ("Luther"). See id. at ¶¶ 21, 28, 40; Inquest

Submission at ¶ 11. When, in September 1999, Mubanda left Merrill Lynch and joined

Schwab, he persuaded the Rodriguezes to transfer their accounts to that brokerage firm. See

Compl. at ¶ 32; Inquest Submission at ¶ 17. As the accounts were being transferred, Andres

wrote to Schwab and requested that the assets in these accounts be divided equally between

himself and Yolanda C. See Compl. at ¶ 32; 9/29/99 Letter from Andres Rodriguez to

Charles Schwab, attached as Exh. C to Compl. and as Exh. H to Inquest Submission. This

request was apparently made in anticipation of divorce proceedings between the Rodriguezes

that commenced in November 1999 (see Compl. at ¶ 18), but that were never finalized in light

of the couple's subsequent efforts at reconciliation (see Supplemental Supporting Affidavit of

Gloria Rodriguez ["Gloria Aff."] at ¶ 5). Thereafter, Andres held two accounts at Schwab in

---

[2] It appears that the Rodriguezes had two accounts at Merrill Lynch, account # 849-12Y89 and
a Cash Maintenance Account.

his name only, an IRA and a Schwab One Account.  See Inquest Submission at Exh. I.  It is

not clear whether Yolanda C. held any Schwab accounts in her name only, although there are

hints in the record that she and her husband continued to maintain a joint account at Schwab.[3]

But see Compl. at ¶ 32 ("[T]he deceased transferred their financial assets . . . to *two* separate

accounts with Charles Schwab . . . .") (emphasis added).

On September 25, 2000, Andres created The Andres Rodriguez Trust, a revocable trust

for his benefit (see The Andres Rodriguez Trust Agreement ["Trust Agreement"], attached as

Exh. C to Milligan 2d Suppl. Aff.), the corpus of which consisted of his Schwab One Account

(see Trust Agreement at 1, Schedule A).  Pursuant to the Trust Agreement, Yolanda M.

Rodriguez ("Yolanda M."), another daughter of the Rodriguezes, became co-trustee of the

trust, along with Andres.  See id. at 1.  The Trust Agreement further provided for the trust's

disposition if Andres predeceased Yolanda C.  Under this contingency, the trustee was to "set

aside and hold [in trust] . . . an amount equal to the largest amount that will result in the

lowest, or no, federal estate tax on the Grantor's estate . . . ."  Id. at art. 8(A)-(B).  From this

trust (hereinafter "the Primary Trust"), Yolanda C., at the discretion of the trustee, could

receive "so much or all of the net income and principal of the trust" for her "health,

maintenance or support" during her lifetime.  Id. at art. 8(B)(1)-(2).  A second trust

---

[3]  Gloria's affidavit refers to her "parents' Charles Schwab account" and references a
conversation with a Schwab representative during which mention was made of an alleged faxed
authorization from "both account holders" for certain transactions.  Gloria Aff. at ¶¶ 17, 19.
In addition, Andres' September 2000 Schwab One Account statement contains the handwritten
notation "AR/YCR - JNT" next to two withdrawals journaled to account #75608387.  See
September 2000 Schwab One Account Statement at 6 (Inquest Submission at Exh. I).

(hereinafter "the Residuary Trust") was also to be created from the balance of the trust estate. See id. at art. 9(A)(1). Yolanda C. would hold a beneficial interest in the Residuary Trust, entitling her to the net income on the trust principal, and, at the discretion of the trustee, that portion of the trust principal needed for her "health, maintenance or support" during her lifetime. Id. at art. 9(A)(1)-(2), (4). Yolanda C. would also have "the power, exercisable annually, to compel the Trustee to withdraw from any IRA or other qualified plan account payable to [the Residuary] [T]rust an amount equal to all of the income earned on the assets of such IRA or other qualified plan and to distribute that amount to [Yolanda C.]." Id. at art. 9(A)(3). Upon the death of Yolanda C., the undistributed income on the assets in the Primary Trust and the principals of both trusts would be distributed to Andres' "then living issue." Id. at arts. 8(B)(2), (9)(A)(4).

On September 28, 2000, three days after creating the trust, Andres passed away, leaving a will that named Yolanda M. as executrix of his estate. See Last Will and Testament of Andres Rodriguez ("Andres' Will") at 5, attached as Exh. B to Milligan 2d Suppl. Aff. Under the terms of the Will, Andres' tangible personal property passed to Yolanda M., and his residuary estate, presumably including the Schwab IRA account, was to be added to the principal of The Andres Rodriguez Trust. See Andres' Will at 1. Yolanda C. survived her husband by only three weeks, passing away on October 18, 2000. See Certificate of Death of Yolanda C. Rodriguez, attached as Exh. E to Compl. Under Yolanda C.'s will, Gloria became executrix of her mother's estate. See Last Will and Testament of Yolanda C. Rodriguez ("Yolanda C.'s Will") at first page, attached as Exh. D to Milligan 2d Suppl. Aff.

Both Gloria and Yolanda M. survived their parents.

Following her parents' deaths, Gloria began a review of their financial affairs and discovered suspicious activity in their Merrill Lynch and Schwab accounts. See generally Gloria Aff. Gloria learned that, while employed at Merrill Lynch, Mubanda had solicited and received a $7,500 monetary gift from her parents, and forged Andres' signature on two checks, each in the amount of $40,000, that were drawn on her parents' Cash Maintenance Account and made payable to Luther. See Compl. at ¶¶ 19, 57, Exh. B; Gloria Aff. at ¶¶ 13-14. Gloria also suspected that Mubanda had churned her parents' Merrill Lynch accounts. See Compl. at ¶ 26; Gloria Aff. at ¶ 9. In addition, she discovered that in 2000, while employed at Schwab, Mubanda had instituted two unauthorized wire transfers, one for $40,000 and the other for $60,000, to fictitious entities; and that following Andres' death, Mubanda had engaged in securities trading, which may have been excessive. See Compl. at ¶¶ 34-37, 52-53; Gloria Aff. at ¶¶ 15-20.

Gloria objected to the probate of Andres' Will and Yolanda M. objected to the probate of Yolanda C.'s Will. See Stipulation of Settlement between Gloria Rodriguez and Yolanda M. Rodriguez ("Settlement Agreement") at 2 (Inquest Submission at Exh. K). In settlement of their disputes regarding the probate of the wills, the sisters executed a stipulation of settlement which, as relevant to the instant litigation, provided:

> Any recovery by the parties, individually or as executor of the estate of either ANDRES RODRIGUEZ or YOLANDA C. RODRIGUEZ, against . . . Mubanda . . . and/or [PF] . . . shall be paid, net of legal fees and other expenses directly related to such recovery, 60% to GLORIA RODRIGUEZ and 40% to YOLANDA M. RODRIGUEZ. Each party shall be free to use counsel of her choice in connection with any action or proceeding against Mubanda,

[and/or PF] . . . and each party agrees to cooperate in the prosecution of any
such action or proceeding.

Id. at ¶ 4.

## B.    Procedural History

On July 1, 2002, Gloria, solely in her capacity as executrix of Yolanda C.'s Estate,

instituted the instant action seeking recovery against Mubanda, PF and Merrill Lynch for the

alleged churning of the Rodriguezes' Merrill Lynch accounts (see Compl. at ¶¶ 24-30); against

Mubanda, PF, Luther and Merrill Lynch for the forged checks (see id. at ¶¶ 19-23); against

Mubanda for the unauthorized wire transfers, and for the solicitation and acceptance of the

monetary gift (see id. at ¶¶ 51-58); and against Mubanda, PF and Schwab for unauthorized and

excessive trading on Andres' Schwab accounts following his death (see id. at ¶¶ 31-50).

Plaintiff subsequently settled the claims against Merrill Lynch for $33,000; settled the

claim against Luther for $7,000 (see Inquest Submission at ¶ 26); and discontinued, without

prejudice, the claim against Schwab (see Notice of Dismissal dated 9/27/02).[4]  Thus, the only

remaining defendants are Mubanda and PF, both of whom were properly served,[5] but neither

of whom has answered the Complaint or otherwise appeared in or defended this action.

---

[4]  It appears that the claims against Schwab were discontinued in anticipation of arbitration.
See 9/27/02 Letter from Jonathan Uretsky, Esq., counsel for Schwab, to Joseph Milligan, Esq.
(noting that Schwab had not filed a motion to compel arbitration due to agreement that the
claim against it would be dismissed voluntarily), submitted with Docket Entry #14.

[5]  Service upon Mubanda was made by delivery of the summons and complaint to Luther, a
person of suitable age and discretion (see Inquest Submission at Exh. B), and service upon PF
was also made by delivery of the summons and complaint to Luther, who was the managing
agent of PF and "authorized . . . to receive" service of process (id. at Exh. C).

On August 13, 2003, the Clerk of the Court entered notations of default against

Mubanda and PF. Thereafter, plaintiff's motion for a default judgment against Mubanda and

PF was referred to the undersigned magistrate, who ordered plaintiff to serve and submit, by

October 23, 2003, supplemental papers including, *inter alia*:

> A detailed discussion of the factual and legal bases for each of the causes of
> action against Mubanda and/or P[F]; . . . [a]n explanation as to why the estate
> of Andres Rodriguez is not named as a plaintiff in this case and a legal and
> factual discussion as to whether that estate has any interest in the subject matter
> of this lawsuit and, if not, why not; [and] [t]he factual and legal bases for the
> damages sought by plaintiff from Mubanda and P[F], including but not limited
> to . . . a detailed description of how the damages were calculated, and
> documentation supporting said calculations . . . .

10/3/03 Order at 1-2.

On June 7, 2004, nearly eight months after plaintiff's time to respond to the 10/3/03

Order had expired, plaintiff's counsel wrote to this Court to request an extension of time, to

June 25, 2004, to respond to the order (see 6/7/04 Letter to the Court from Joseph A.

Milligan, Esq. ["6/7/04 Milligan Letter"]), which this Court granted (see 6/7/04 Order

endorsed on 6/7/04 Milligan Letter). Plaintiff's Inquest Submission was subsequently filed.

The content and adequacy of the Inquest Submission are discussed as relevant below.

After reviewing the Complaint and Inquest Submission, this Court became concerned

that the sole plaintiff in this action did not have standing to assert all of the claims and that the

Estate of Andres Rodriguez should have been joined as a necessary party. In that connection,

the Court ordered plaintiff's counsel to confer with counsel for Yolanda M. and to notify the

Court as to whether plaintiff planned to seek leave to add Yolanda M. as a plaintiff in her

capacity as executrix of Andres' Estate. See 11/22/04 Order at 2. The Court further directed

that plaintiff, in the event that she sought to pursue this action as the sole plaintiff, show cause

why her claims should not be dismissed for failure to join an indispensable party and/or lack of

standing.  See id.  Thereafter, plaintiff's counsel informed the Court that no additional

plaintiffs would be added and submitted an affirmation purporting to explain why Andres'

Estate was not an indispensable party and how plaintiff has standing to pursue the claims.  See

generally Milligan 2d Suppl. Aff.

## II.  DISCUSSION

### A.    Standards for Determining Liability and Damages on Default

Upon entry of a default, all the well-pleaded factual allegations of the complaint related

to liability are deemed to have been admitted by the defaulting defendants.  See, e.g., Thomson

v. Wooster, 114 U.S. 104, 111 (1885); Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty

Corp., 973 F.2d 155, 158 (2d Cir. 1992); Montcalm Publ'g Corp. v. Ryan, 807 F.Supp. 975,

977 (S.D.N.Y. 1992); see also 10 Moore's Federal Practice ¶ 55.12[1] (Matthew Bender 3d

ed.).  "Even after default, however, it remains for the court to consider whether the

unchallenged facts constitute a legitimate cause of action, since a party in default does not

admit mere conclusions of law."  10A Wright, Miller & Kane, Federal Practice and

Procedure: Civil 3d § 2688, at 63 (1998); see also In re Wildlife Ctr., Inc., 102 B.R. 321, 325

(Bankr. E.D.N.Y. 1989) (quoting 10 Wright & Miller, Federal Practice and Procedure: Civil

§ 2688, at 447-48).  Accordingly, a defendant's default does not necessarily conclusively

establish its liability.  See, e.g., Buffalo Laborers Welfare Fund v. Toporczyk, No. 03-CV-

0899E(F), 2004 WL 3267286, at *2-3 (W.D.N.Y. Oct. 25, 2004) (denying default judgment

on breach of contract and ERISA claims where the plaintiff failed to provide, *inter alia*, evidentiary proof that the defaulting defendant was bound by the collective bargaining agreement at issue); Evanauskas v. Strumpf, No. CIV.A.300CV1106JCH, 2001 WL 777477, at *2 (D. Conn. June 27, 2001) (denying default judgment sought for violation of the Connecticut Unfair Trade Practices Act where the plaintiff failed to allege or demonstrate that the defendants' actions involved "the conduct of any trade or commerce," as required to sustain such a claim); Ghartey v. Chrysler Credit Corp., No. CV-92-1782 (CPS), 1992 WL 373479, at *4-5 (E.D.N.Y. Nov. 23, 1992) (denying default judgment on Fair Debt Collection Practices Act claim where the plaintiff did not allege that the defaulting defendant made any threats or took any other acts in violation of the statute).

Where the factual allegations in a complaint are insufficient to support a valid cause of action, but subsequent evidence adduced at a default inquest would cure the complaint's deficiency, a court should permit the plaintiff to amend its pleadings to reflect that subsequently produced evidence. See Au Bon Pain Corp. v. Artect, Inc. 653 F.2d 61, 65-66 (2d Cir. 1981). Indeed, in such a situation, at least one court in this Circuit has *sua sponte* amended a complaint by court order in light of subsequent proof. See Rivera v. Ielardi, No. 82 Civ. 7082-CSH, 1986 WL 981, at *2 (S.D.N.Y. Jan. 15, 1986). As such, it is appropriate to consider both the allegations in the complaint and the evidence adduced at an inquest in determining whether a legitimate claim has been pled.

Once a party's default liability is ascertained, the court must determine the amount of damages to award for each valid cause of action. However, "[w]hile a party's default is

deemed to constitute a confession of all well pleaded allegations of liability, it is not considered

an admission of damages." <u>Greyhound Exhibitgroup</u>, 973 F.2d at 158; <u>see</u> <u>also</u> Fed. R. Civ.

P. 8(d). Rather, the plaintiff must provide evidence that substantiates the amount of damages

actually suffered. <u>See</u> <u>In re Crazy Eddie Sec. Litig.</u>, 948 F.Supp. 1154, 1160 (E.D.N.Y.

1996).

**B.      Plaintiff's Theories of Liability**

Plaintiff seeks a default judgment and damages against Mubanda for his alleged  (1)

churning of the Rodriguezes' joint Merrill Lynch accounts from 1998 to September 1999 (<u>see</u>

Compl. at ¶¶ 24-26 (Fourth Cause of Action)); (2) unauthorized and excessive trading on

Andres' Schwab accounts subsequent to the deaths of the Rodriguezes (<u>see</u> <u>id.</u> at ¶¶ 31-38

(Seventh Cause of Action)); (3) unauthorized withdrawals from, and forgery of Andres'

signature on two checks drawn on, the Rodriguezes' joint Merrill Lynch account (<u>see</u> <u>id.</u> at

¶ 19 (First Cause of Action)); (4) unauthorized wire transfers to fictitious entities (<u>see</u> <u>id.</u> at

¶¶ 51-55 (Tenth Cause of Action)); and (5) solicitation and acceptance of a monetary gift from

the Rodriguezes (<u>see</u> <u>id.</u> at ¶¶ 56-58 (Eleventh Cause of Action)). A default judgment and

damages are also sought against PF in claims that mirror the first three of the above claims.

<u>See</u> <u>id.</u> at ¶¶ 20-21, 27-28, 39-44 (Second, Fifth and Eighth Causes of Action). Plaintiff

additionally seeks legal fees from both defendants. <u>See</u> <u>id.</u> at ¶¶ 59-60 (Twelfth Cause of

Action).

As a result of plaintiff's inadequate response to this Court's order seeking a detailed

discussion of "the factual *and legal* bases for each of the causes of action against Mubanda

and/or P[F]" (10/3/03 Order at 1 (emphasis added)), this Court has been constrained to speculate on the legal theories upon which several of these claims rest. While plaintiff's Inquest Submission reveals that the claim for churning of the Merrill Lynch accounts is brought under the Securities Exchange Act of 1934, and the claim for solicitation and acceptance of a monetary gift is brought pursuant to Securities and Exchange Commission ("SEC") Rule 17a-3(a)(19)(i), plaintiff fails to specify the precise bases for liability for the unauthorized and excessive trading of Andres' Schwab accounts, the check forgeries, and the unauthorized wire transfers. Instead, plaintiff states that "each of the causes of action set forth in the complaint are based upon the defendants' commission of securities fraud, common law fraud, breach of fiduciary duty, breach of contract and egregious handling of [the Rodriguezes'] accounts. These actions constitute violations of the Securities Exchange Act of 1934 . . . ." Inquest Submission at ¶ 12. At no point, however, does plaintiff articulate the requirements for these various theories of liability,[6] apply the facts of the individual claims to those theories, or, with respect to the non-federal bases for liability (to wit, the breach of contract, breach of fiduciary duty, common law fraud and egregious handling of accounts theories), suggest which state's law governs.

### 1. The Claim for Churning the Rodriguezes' Merrill Lynch Accounts

The fourth and fifth causes of action allege that Mubanda and PF churned the

---

[6] For example, despite her "breach of contract" theory of liability, plaintiff has neither alleged nor provided evidence of the existence of any specific contract or agreement between the Rodriguezes and Mubanda, PF, Merrill Lynch and/or Schwab.

Rodriguezes' Merrill Lynch accounts.[7]  Churning is synonymous with "'overtrading' and . . .

refers to the excessive rate of turnover in a controlled account for the purpose of increasing the

amount of [the broker's] commissions."  Armstrong v. McAlpin, 699 F.2d 79, 90 (2d Cir.

1983) (internal citations omitted).  Churning is a form of securities fraud actionable under

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (2000) ("Section

10(b)"), which proscribes the use of "any manipulative or deceptive device or contrivance in

contravention of such rules and regulations as the [Securities and Exchange] Commission may

prescribe as necessary or appropriate in the public interest or for the protection of investors."

Id.

In order to assert a churning claim under Section 10(b), the "plaintiff must allege (1)

that the trading in his account was excessive in light of his investment objectives; (2) that the

broker exercised control over the account[;] and (3) that the broker acted with intent to defraud

or with willful or reckless disregard for the interests of his client."  Siegel v. Tucker, Anthony

& R.L. Day, Inc., 658 F.Supp. 550, 553 (S.D.N.Y. 1986).  In addition, as with any securities

fraud claim, "the actual fraudulent statements or conduct and the fraud alleged must be stated

with particularity," consistent with Rule 9(b) of the Federal Rules of Civil Procedure.  Chill v.

General Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996).

To comply with the first element of a churning claim, "[a] plaintiff must set forth facts

that allow the determination of whether or not trading was excessive."  Moran v. Kidder

---

[7]  Plaintiff's allegations involving the Schwab accounts are contained in separate claims and are discussed *infra* pp. 26-32.

Peabody & Co., 609 F.Supp. 661, 666 (S.D.N.Y. 1985). To that end, the complaint must articulate the nature of the customer's investment goals and objectives, and whether such was communicated to the defendant, see Frota v. Prudential-Bache Sec., Inc., 639 F.Supp. 1186, 1191-92 (S.D.N.Y. 1986), and must also provide "a statement of facts which is sufficient to, at the very least, permit a rough ascertainment of either the turnover ratio or the percentage of the account value paid in commissions." D'Addio v. L.F. Rothschild Inc., 697 F.Supp. 698, 703 (S.D.N.Y. 1988) (quoting Polera v. Altorfer, Podesta, Woolard & Co., 503 F.Supp. 116, 118 (N.D. Ill. 1980)); see also Moran, 609 F.Supp. at 666.

Plaintiff has failed to meet these requirements. Neither the Complaint nor the Inquest Submission sets forth the Rodriguezes' investment goals, or provides information sufficient to estimate the turnover ratios on their Merrill Lynch accounts or the percentage of the account values that were paid as commissions. Instead, the Complaint's allegations with respect to excessive trading are wholly conclusory, stating only that Mubanda and PF "engaged in excessive day trading for the sole purpose of generating excessive commissions and not for sound trading purposes" (Compl. at ¶¶ 26, 28); the Inquest Submission does not cure the deficiencies in the Complaint.[8]

---

[8] Plaintiff apparently believes that her conclusory allegation of excessive trading is supported by the fact that Yolanda C. hired an attorney "to investigate whether or not [Mubanda] had in fact, 'churned' the Rodriguez's accounts," and by the fact that "an investigation was undertaken by the National Association of Securities Dealers (NASD) based on those complaints." Inquest Submission at ¶ 18. That Yolanda C. hired an attorney to investigate Mubanda, however, is merely a procedural fact, no more probative of whether trading was excessive than the fact that plaintiff brought the instant action. Further, the NASD's investigation into Mubanda does not create an inference of excessive trading. Indeed, the letter
(continued...)

The Inquest Submission repeatedly acknowledges the significance of customers' "investment objectives" to a churning claim (Inquest Submission at ¶¶ 15, 16, 19), but at no time reveals what the Rodriguezes' objectives were. Citing the fact that, at the time the alleged churning took place, Andres and Yolanda C. were 75 and 74 years old, respectively, plaintiff contends that the age of a customer is a factor "in determining . . . whether there was disproportionately high turnover" on an account. Id. at ¶ 19. This Court has found no authority for this proposition. Although a customer might take her own age into consideration in developing her investment goals, age is not determinative of those investment goals and does not, at any rate, shed any light on the turnover ratio in an account.[9] See, e.g., Frota, 639 F.Supp. at 1191-92 (dismissing churning claim for failure to state investment goals and noting that, while the plaintiffs' "age and lack of investment experience" might indicate that the plaintiffs "were interested in a safe, steady stream of retirement income[,] . . . it is [also] possible that they were interested in more speculative investments . . . ."). Indeed, although plaintiff would have the Court infer from the Rodriguezes' ages that their investment goals were conservative, the activity letter sent from Merrill Lynch to the Rodriguezes in October 1998 indicates that their investment goal may have been "[t]otal [r]eturn" and their risk

---

[8](…continued)
from the NASD announcing its investigation specifically disclaims that the initiation of an investigation amounts to a determination that Mubanda violated NASD rules. See 2/23/00 Letter from Diane Landry Fisher to Mitchell A. Greebel at 1 (Inquest Submission at Exh. Q).

[9] A customer's age is, however, one of many factors pertinent to the determination of whether a broker has taken control of a non-discretionary account. See Cruse v. Equitable Sec. of New York, Inc., 678 F.Supp. 1023, 1031 (S.D.N.Y. 1987).

tolerance may have been "[a]ggressive."  See 10/13/98 Letter from Thomas P. Rasmussen of

Merrill Lynch to the Rodriguezes ("10/13/98 Merrill Lynch Letter"), attached as Exh. G to

Inquest Submission.[10]

Nor does the 10/13/98 Merrill Lynch Letter assist plaintiff in meeting the excessiveness

prong of her churning claim.  Contrary to plaintiff's assumption, the letter cannot be

characterized as "written notification of the excessive number of transactions in [the

Rodriguezes'] account . . . ."  Inquest Submission at ¶ 16.  While the letter does note that,

"[b]etween January and July [1998] . . . a total of 117 transactions took place [on account #

849-12Y89] generating $56,308 in commissions" (10/13/98 Merrill Lynch Letter), at no point

does the letter state that this amount of trading was excessive in light of the Rodriguezes'

investment objectives, nor does it provide sufficient information by which to estimate the

turnover ratio or percentage of account value paid in commissions.

Because the Complaint and Inquest Submission are devoid of information on the

Rodriguezes' investment goals or the account values at the time the alleged churning occurred,

plaintiff has failed to satisfy the excessiveness prong of her churning claim.  Accord Moran,

609 F.Supp. at 666 ("Moran has failed to address the issue of investment objectives, and his

conclusory statements as to the excessiveness of the trading and commissions are not enough to

---

[10]  The letter asked the Rodriguezes to confirm their investment objectives by signing and
returning a copy of the letter to Merrill Lynch.  See 10/13/98 Merrill Lynch Letter.  Because
the Rodriguezes never acknowledged the letter (see Inquest Submission at ¶ 16), it is possible
that the letter's description of their investment goals and risk tolerance was inaccurate.
Significantly, however, the Rodriguezes did not terminate their relationship with Mubanda
after this disclosure; indeed, the following year, when Mubanda left Merrill Lynch to join
Schwab, the Rodriguezes transferred their funds to Schwab in order to continue the
relationship.

overcome this requirement."). Courts faced with less deficient allegations of excessiveness have rejected churning claims. See, e.g., Lesavoy v. Lane, 304 F.Supp.2d 520, 531 (S.D.N.Y. 2004) ("Simply appending monthly accounts to the complaint does not 'satisfy the requirement that a plaintiff set forth facts that would permit the calculation of . . . the percentage of the account value paid in brokerage commissions.'") (quoting Moran, 609 F.Supp. at 666); Goodman v. Shearson Lehman Bros., Inc., 698 F.Supp. 1078, 1085 (S.D.N.Y. 1988) (excessiveness element of churning claim not satisfied where the "complaint adequately plead[ed] specific turnover ratios with respect to each of plaintiff's accounts, [but] it fail[ed] to specify the content of plaintiff's communications to defendants as well as when and to whom her investment objectives were conveyed."); Frota, 639 F.Supp. at 1191 (excessiveness element not adequately pled despite allegation that defendant, "'contrary to [plaintiffs'] instructions and objectives, given their investment goals and advanced age, engaged in excessive . . . trading . . . and 'churned' the account for purposes of generating commissions for themselves.'") (quoting complaint).

Plaintiff has also failed to sufficiently allege Mubanda or PF's control over the Rodriguezes' Merrill Lynch accounts. To satisfy the control element, a plaintiff must allege that the account at issue "was discretionary or [must plead] other facts which would establish the broker's control" over the account. Bogart v. Shearson Lehman Bros., Inc., No. 91 Civ. 1036 (LBS) (NG), 1993 WL 33643, at *4 (S.D.N.Y. Feb. 3, 1993). Neither the Complaint nor Inquest Submission notes that the Rodriguezes' Merrill Lynch accounts were discretionary, and Gloria's affidavit statement that Mubanda "had total control over [her] parents' accounts"

(Gloria Aff. at ¶ 21), is insufficient to satisfy the control element in the absence of facts to support that conclusion.[11]  Accord Tucker v. Janney Montgomery Scott, Inc., No. 96 CIV 1923(LLS), 1997 WL 151509, at *3 (S.D.N.Y. Apr. 1, 1997) (plaintiff's "allegation that defendants 'exercised control over her account' . . . is too conclusory—that is, does not set forth specific facts establishing such control—to satisfy that requirement."); Heller v. L.F. Rothschild Unterberg, Towblin, 631 F.Supp. 1422, 1425 (S.D.N.Y. 1986) (holding that conclusory allegations of "effective control" were insufficient to satisfy control element of churning claim); but see Zaretsky v. E.F. Hutton & Co., 509 F.Supp. 68, 74-75 (S.D.N.Y. 1981) (concluding that allegation that the defendant "exercised effective control over the [plaintiff's] account" was sufficient to meet control element where the corporate defendant had "received notice of the particular account in issue, the relevant time period, the specific securities transactions and the identity of the Hutton representative allegedly in control of the account.").[12]

---

[11] Gloria's affidavit alleges that, during the year preceding his death:  Andres was "extremely ill and was in no way capable of handling his own affairs"; Mubanda traded on the Schwab accounts just prior to Andres' death, at a time when Gloria "was very aware of the daily activities of both of [her] parents, and discussing or authorizing stock trading was not something they were spending time doing"; and Mubanda traded on the accounts during the period between Andres and Yolanda C.'s deaths and after the latter died.  Gloria Aff. at ¶¶ 10, 15.  These facts tend to support the conclusion that in 2000, Mubanda exercised control over Andres' *Schwab* accounts; they do not, however, shed light on whether, in prior years, Mubanda similarly exercised control over the Rodriguezes' Merrill Lynch accounts, which were closed in 1999, when the funds were transferred to Schwab.

[12] The scienter element of a securities fraud claim is satisfied where a complaint contains "facts that give rise to a strong inference of fraudulent intent." Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995); see also 15 U.S.C. § 78u-4(b)(2).  Had plaintiff satisfactorily pled the excessiveness and control elements of her churning claim, her averment that Mubanda

(continued...)

-17-

Because plaintiff has wholly failed to adequately allege that churning occurred on the Rodriguezes' Merrill Lynch accounts, this Court recommends that default judgments on the fourth and fifth claims be denied.[13]

### 2. The Monetary Gift

Contending that "[a]cceptance of gifts from a customer is prohibited by SEC Rule[] 17a-3(a)(19)(i)" (Inquest Submission at ¶ 22), plaintiff seeks to recover the $7,500 gift that Mubanda allegedly "illegally solicited and accepted" from the Rodriguezes in December 1998 (Compl. at ¶¶ 56-58). Plaintiff mistakenly relies on SEC Rule 17a-3(a)(19)(i), 17 C.F.R. § 240.17a-3(a)(19)(i) (hereinafter, "the Rule"), as a basis for holding Mubanda liable.

As an initial matter, the Rule was not promulgated until November 2001, see 66 Fed.

---

[12](...continued)
traded on the Rodriguezes' accounts in order to earn commissions would have satisfied the scienter required in a properly pled churning claim, as "[c]hurning, in and of itself, may be a deceptive and manipulative device under section 10(b), the scienter required by section 10(b) being implicit in the nature of the conduct." Armstrong, 699 F.2d at 91.

[13] Even if plaintiff had properly pled churning of the Rodriguezes' Merrill Lynch accounts, she would not be entitled to the $500,000 in damages she seeks. See Inquest Submission at ¶ 30. Plaintiff has not substantiated this amount (contrary to her assertion, the documents attached as Exhibit I to the Inquest Submission relate only to the Schwab accounts, not the Merrill Lynch accounts); indeed, she admits that her $500,000 figure is a "best estimate, given the amounts contained in [the Rodriguezes'] accounts, the frequency of trading, and the fact that the account value of one account" decreased by $700,000. See Inquest Submission at ¶ 30. Even had she provided evidence to substantiate these numbers, she would not be entitled to the full amount as, in this Circuit, the measure of damages in a churning action is "not the change in market value of a portfolio but the amount of commissions, fees, interest and taxes paid to defendant because of illegal activity." Zaretsky, 509 F.Supp. at 73. Thus, based on the limited evidence of damages that plaintiff has provided, this Court would have calculated the loss at $58,308, which reflects the amount of commissions generated from trading on Merrill Lynch account # 849-12Y89 between January and July 1998. See 10/13/98 Merrill Lynch Letter.

Reg. 55818, 55838 (Nov. 2, 2001), and not effective until May 2, 2003, see 66 Fed. Reg.

55818, 55826, nearly three and five years, respectively, after the monetary gift from the

Rodriguezes to Mubanda; plaintiff has supplied no rationale for applying the Rule

retroactively.  Moreover, the Rule does not prohibit gifts from customers to financial

consultants such as Mubanda, but instead outlines the obligations of brokers and dealers to

maintain records of compensation provided to their "associated person[s]" relative to sales and

purchases of securities.  See 17 C.F.R. § 240.17a-3(a)(19)(i) (2004).[14]  Assuming *arguendo*

that Mubanda was an "associated person"[15] and that Merrill Lynch was required to, but failed

to, record Mubanda's receipt of the $7,500 from the Rodriguezes, any such record-keeping

violation affords no basis for holding Mubanda liable for soliciting and accepting a gift from a

customer.  The law is clear that the Rule's authorizing statute, Section 17(a) of the Securities

---

[14]  The Rule provides that the described brokers and dealers and members of national securities exchanges "shall make and keep current . . . [a] record: [a]s to each associated person listing each purchase and sale of security attributable, for compensation purposes, to that associated person.  The record shall include the amount of compensation if monetary and a description of the compensation if non-monetary.  In lieu of making this record, a member, broker or dealer may elect to produce the required information promptly upon request of a representative of a securities regulatory authority."  17 C.F.R. § 240.17a-3(a)(19)(i).

[15]  "The term 'person associated with a broker or dealer' or 'associated person of a broker or dealer' means any partner, officer, director, or branch manager of such broker or dealer (or any person occupying a similar status or performing similar functions), any person directly or indirectly controlling, controlled by, or under common control with such broker or dealer, or any employee of such broker or dealer . . . ."  15 U.S.C. § 78c(a)(18) (2000); see also 15 U.S.C. § 78c(a)(21) (2000) ("The term 'person associated with a member' or 'associated person of a member' when used with respect to a member of a national securities exchange or registered securities association means any partner, officer, director, or branch manager of such member (or any person occupying a similar status or performing similar functions), any person directly or indirectly controlling, controlled by, or under common control with such member, or any employee of such member.").

Exchange Act of 1934, 15 U.S.C. § 78q, creates no private right of action for damages.  See

Touche Ross & Co. v. Redington, 442 U.S. 560, 576 (1979).  Consequently, this Court

recommends denial of plaintiff's motion for a default judgment on her eleventh claim.

### 3.  The Check Forgeries

In connection with the first and second claims, the Complaint alleges that "[o]n or

about January 20, 1999 and on or about March 16, 1999," Mubanda withdrew a total of

$80,000 from the Rodriguezes' joint Cash Maintenance Account at Merrill Lynch by writing

and forging Andres' signature on two checks, each for $40,000, made payable to Luther.

Compl. at ¶¶ 19, 21; id. at Exh. B.  Plaintiff seeks recovery for the check forgeries under

three theories—common law fraud, breach of fiduciary duty, and securities fraud.[16]

Before addressing these theories of liability, this Court must first determine which

state's law to apply to the non-federal theories.  Federal courts exercising their supplemental

jurisdiction over state law claims "apply the choice of law rules of the forum state," Rogers v.

Grimaldi, 875 F.2d 994, 1002 (2d Cir. 1989), which, in this case, is New York.  Since all of

the conduct giving rise to the allegations in the Complaint occurred in New York, Yolanda C.

and her Estate were domiciled in New York, PF[17] and Mubanda conducted business with

---

[16]  This Court will not analyze any of plaintiff's claims under purported breach of contract or
egregious handling theories of liability.  As plaintiff has neither alleged nor provided evidence
of the existence of a specific contract between the Rodriguezes and any of the defendants, she
cannot sustain a claim for breach of contract.  With respect to the "egregious handling" theory
of liability, no such cause of action exists in New York, or elsewhere, for that matter.

[17]  Plaintiff alleges that PF was both "a corporation organized and existing under the laws of
the State of New York" and "a foreign corporation duly licensed and authorized to do business
in the State of New York."  Compl. at ¶¶ 7-8.  In any event, the Court accepts plaintiff's

(continued…)

respect to the Rodriguezes' accounts in New York, and PF's principal place of business is alleged to be New York, this Court concludes that New York law applies to each claim that is brought under a common law theory of liability.[18]

### a. Common Law Fraud

Contrary to plaintiff's suggestion, the check forgery allegations do not state a claim for common law fraud. "Under New York law, the elements of common law fraud are 'a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff.'" Chanayil v. Gulati, 169 F.3d 168, 171 (2d Cir. 1999) (citations omitted). Because neither the Complaint nor plaintiff's other submissions contain any allegations that Yolanda C. (or Andres) relied on the forged signatures to their detriment, plaintiff cannot sustain a cause of action for common law fraud. Moreover, even assuming that the drawee bank that paid out on the checks relied on the forgeries to plaintiff's detriment, "such third-party reliance is not enough to sustain a claim for common law fraud." Morris v. Castle Rock Entm't Inc., 246 F.Supp.2d 290, 296 (S.D.N.Y. 2003); see also Barnhart v. Federated Dep't Stores, Inc., No. 04 Civ 3668 (JGK), 2005 WL 549712, at *8 (S.D.N.Y. Mar. 8, 2005) ("The reliance element of fraud under New York law . . . cannot be

---

[17](…continued)
allegation that PF, regardless of the state in which it was formed, was conducting business in New York.

[18]  The only state other than New York that arguably has an interest in having its law applied to this case is Connecticut, the state of Mubanda's domicile. However, where parties are domiciliaries of different states and the alleged misconduct takes place in one of the party's domicile state, that state's law generally applies. See Caruolo v. John Crane, Inc., 226 F.3d 46, 57 (2d Cir. 2000).

established by showing that only a third party, and not the plaintiff, relied on the defendants'
allegedly false statements.") (collecting cases).

### b. Breach of Fiduciary Duty

Nor do the check forgeries give rise to a claim for breach of fiduciary duty. To state
such a claim for breach of fiduciary duty under New York law, a plaintiff must plead the
existence of a fiduciary relationship, a breach of the duties arising from that relationship, and
damages resulting from the breach. See DDCLAB Ltd. v. E.I. Du Pont de Nemours & Co.,
No. 03-CV-3654GBD, 2005 WL 425495, at *8 (S.D.N.Y. Feb. 18, 2005). "[A] fiduciary
relationship arises when one has reposed trust or confidence in the integrity or fidelity of
another who thereby gains a resulting superiority of influence over the first, or when one
assumes control and responsibility over another." Reuben H. Donnelley Corp. v. Mark I
Mktg. Corp., 893 F.Supp. 285, 289 (S.D.N.Y. 1995). However, "the mere existence of a
broker-customer relationship is not proof of its fiduciary character." Bissell v. Merrill Lynch
& Co., 937 F.Supp. 237, 246 (S.D.N.Y. 1996) (internal quotations omitted). Rather, "the
fiduciary obligation that arises between a broker and a customer as a matter of New York
common law is limited to matters relevant to affairs entrusted to the broker; the scope of the
entrusted affairs generally is thus limited to the completion of the security transaction." Press
v. Chem. Inv. Servs. Corp., 166 F.3d 529, 536 (2d Cir. 1999) (internal quotations and
citations omitted). Moreover, "[i]n the absence of discretionary trading authority delegated by
the customer to the broker . . . a broker does not owe a general fiduciary duty to his client."
Bissell, 937 F.Supp. at 246.

In the case at bar, plaintiff has provided very little information respecting those matters that the Rodriguezes entrusted to Mubanda or PF in connection with the Merrill Lynch accounts. The only allegation in the Complaint and Inquest Submission that could support the existence of a fiduciary relationship is that Mubanda was assigned to manage the Rodriguezes' Merrill Lynch accounts; nevertheless, there are no facts indicating that such account management extended beyond a duty to execute securities transactions as instructed by the Rodriguezes. Moreover, there is no indication that Mubanda had discretionary access to or authority over the Merrill Lynch Cash Management Account from which the forged checks were drawn.[19] Without additional facts tending to suggest the existence of a fiduciary relationship beyond the relationship traditionally found between a broker and customer, plaintiff may not recover for the check forgeries under a breach of fiduciary duty theory of liability. See DDCLAB, 2005 WL 425495, at *8 ("It is incumbent upon a plaintiff to plead some factors in the complaint from which it can be concluded that the parties had a fiduciary relationship.").[20]

---

[19] See *supra* pp. 16-17 and note 11.

[20] Although a broker's misappropriation of customer funds can, in certain circumstances, rise to the level of a breach of fiduciary duty, those cases that have found liability in such situations have done so where the misappropriation was closely connected to securities transactions. See, e.g., In re Nappy, 269 B.R. 277, 297-98 (E.D.N.Y. Bankr. 1999) (finding breach of fiduciary duty where broker embezzled customer funds transferred to him for the express purpose of purchasing certain securities); Gillman v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 404 N.Y.S.2d 258, 260, 262 (Sup. Ct. New York Cty. 1978) (noting, in dictum, that brokerage firm's practice of temporarily withholding customer funds received from securities purchases in order to profit from the interest on those funds amounted to breach of fiduciary duty).

### c.      Securities Fraud

Similarly unavailing is plaintiff's suggestion that the check forgeries violated Section

10(b) of the Securities Exchange Act of 1934.  Not all broker misconduct amounts to securities

fraud under Section 10(b).  See, e.g., Luce v. Edelstein, 802 F.2d 49, 55 (2d Cir. 1986)

("[A]llegations of mismanagement do not state a claim under Section 10(b).").  Rather, to

sustain a Section 10(b) claim, a plaintiff must allege that, "in connection with the purchase or

sale of securities, the defendant, acting with scienter, made a false material representation or

omitted to disclose material information and that plaintiff's reliance on defendant's action

caused plaintiff injury."  In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 264 (2d Cir. 1993)

(internal quotation marks and brackets omitted).  Here, plaintiff has failed to state a claim for

securities fraud because she does not allege that the checks were forged in connection with a

securities transaction.[21]

### d.      Conversion

Although plaintiff has not expressly relied upon a conversion theory of liability, the

_____

[21]  In the Supreme Court's most recent pronouncement on the "in connection with" requirement of Section 10(b), the Court held that the requirement could be met where fraud committed by a securities broker— the misappropriation of the proceeds of the sale of the clients' securities—"coincided with" the sale or purchase of securities.  See SEC v. Zandford, 535 U.S. 813, 822, 824 (2002).  In so holding, the Court distinguished the situation in which "a broker embezzles cash from a client's account," id. at 824 n.4, from a scenario in which a stockbroker writes checks to himself from his customer's discretionary account, knowing that redeeming those checks will require the sale of the customer's securities.  See id. at 821.  The former situation, the Court was careful to note, "would not include the requisite connection to a purchase or sale of securities" to sustain a claim under Section 10(b).  535 U.S. at 824 n.4. Here, plaintiff's first two claims, for check forgery, are analogous to the Court's example of a broker who embezzles cash; since the Complaint in no way alleges that the forgeries were in connection with any securities transactions, they cannot form the basis for a federal securities fraud claim.

Court nevertheless has opted to analyze the check forgery claims under such a theory. <u>See</u>

<u>Newman v. Silver</u>, 713 F.2d 14, 15 n.1 (2d Cir. 1983) ("[T]he nature of federal pleading . . .

is by statement of claim, not by legal theories."). Under New York law, "[c]onversion is any

unauthorized exercise of dominion or control over property . . . which interferes with and is in

defiance of a superior possessory right of another in the property." <u>Hart v. City of Albany</u>,

706 N.Y.S.2d 535, 536 (3d Dep't 2000) (internal quotation marks and citation omitted).

Where the subject of a conversion is money, "it must be specifically identifiable and be subject

to an obligation to be returned or to be otherwise treated in a particular manner. The funds of

a specific, named bank account are sufficiently identifiable." <u>Republic of Haiti v. Duvalier</u>,

626 N.Y.S.2d 472, 475 (1ˢᵗ Dep't 1995) (internal citations omitted); <u>see also</u> <u>Am. Fin. Servs.</u>

<u>Group v. Treasure Bay Gaming & Resorts, Inc.</u>, No. 99 Civ. 1068 NT, 2000 WL 815894, at

*11 (S.D.N.Y. June 23, 2000) ("An action for conversion of money lays where there is a

specific, identifiable fund and an obligation to return or otherwise treat [it] in a particular

manner . . . .") (internal quotation marks and citations omitted) (bracket in original).

    The Complaint alleges that Mubanda, without the Rodriguezes' authorization, twice

withdrew $40,000 from one of their joint accounts at Merrill Lynch by forging two checks

made payable to Luther, Mubanda's wife. <u>See</u> Compl. at ¶¶ 19, 21. Plaintiff identifies the

dates the checks were forged, specifies the amount of each conversion and links the converted

funds to a specific, named account—the Rodriguezes' jointly owned Cash Maintenance

Account at Merrill Lynch. <u>See</u> <u>id.</u> at ¶¶ 19, 21; <u>id.</u> at Exh. B. These allegations are sufficient

to sustain conversion of money claims under New York law, such that entry of a default

judgment on the first and second claims in the Complaint is warranted as against Mubanda and PF, respectively.

### 4. *Trading on Andres' Schwab Accounts Subsequent to his Death*

Although far from clear, it appears that in the seventh and eighth claims, plaintiff seeks to hold Mubanda and PF liable for trading that occurred in Andres' Schwab accounts, after Andres' death, under churning and/or unauthorized trading theories of liability,[22] both of which are forms of securities fraud that are actionable under Section 10(b) of the Securities Exchange Act of 1934.[23] However, even assuming *arguendo* that the allegations in the Complaint and evidence in the Inquest Submission would suffice to sustain these causes of action (but see *supra* pp. 12-17), this Court would recommend against entry of a default judgment in plaintiff's favor on these claims, because plaintiff has neither proved the damages, if any, sustained by the estate of Yolanda C. as a consequence of the post-mortem trading,[24] nor suggested a method by which the Court could calculate those damages.

---

[22]  The Complaint refers to "unauthorized trading that occurred between September 28, 2000 and October 23, 2000 [sic] . . . for the sole purpose of generating high commissions" and "unauthorized trading" after the Rodriguezes' deaths (Compl. at ¶¶ 35-36, 41-42); and the Inquest Submission references "excessive trading" before, during and after the Rodriguezes' deaths and "unauthorized trading" after their deaths (Inquest Submission at ¶¶ 20-21).

[23]  The Second Circuit has acknowledged, in dictum, the existence of a claim under Section 10(b) "for unauthorized trading, which occurs when a broker intentionally places trades without obtaining the customer's approval . . . ." Caiola v. Citibank, N.A., New York, 295 F.3d 312, 323-24 (2d Cir. 2002).

[24]  Plaintiff has not complained that any churning of the Schwab accounts occurred prior to Andres' death. From the few records submitted to the Court, it appears that in 2000, the Schwab IRA account substantially increased in value before Andres' death. See August 2000 Schwab IRA Account Statement at 1 (Inquest Submission at Exh. I) (reflecting $186,872.36 increase in account value between January 1 and August 31, 2000, and $127,186.68 increase in account value in August 2000).

Plaintiff claims damages in the amount of $730,000 as a consequence of the post-mortem trading on Andres' accounts. See Inquest Submission at ¶ 31. Although plaintiff asserts that this figure represents "$580,000 in post-mortem trading, and [$]150,000 in commissions paid . . . on those trades" (id.), this Court, after reviewing the Schwab account statements, has been unable to discern how plaintiff arrived at this breakdown between the amount of post-mortem trading and commissions paid. Rather, it appears that plaintiff reached the $730,000 figure by approximating the aggregate diminution in value of Andres' IRA account between September 1, 2000 and December 31, 2000, and of Andres' Schwab One account between September 30, 2000 and December 31, 2000.[25] See Inquest Submission at ¶ 20; id. at Exh. I. This Court has serious doubts about the appropriateness of the time periods and method used to calculate these damages.

First, although it is difficult to discern from plaintiff's Complaint the precise time period for which she seeks recovery for the unauthorized and excessive trading on Andres' accounts, the Inquest Submission clarifies that recovery is sought "for losses incurred and commissions paid on trades made after the deaths of Andres and Yolanda C. Rodriguez." Inquest Submission at ¶ 21.[26] Thus, liability and damages are sought for injuries resulting from trading that occurred, at the earliest, on the date of Andres' death, September 28, 2000.[27]

---

[25] The total, combined diminution in the account values during these periods was $735,313.61.

[26] Plaintiff's Inquest Submission erroneously contains two paragraphs numbered 21. The paragraph referenced above is the first of the two.

[27] Although plaintiff mentions trading that occurred "right up until Andres Rodriguez's death" (Inquest Submission at ¶ 20), neither the Complaint nor the Inquest Submission requests a finding of liability for this trading.

Therefore, the diminution in the value of the IRA between September 1 and September 28 should not be part of the damages calculation.

Second, it does not appear that plaintiff, as executrix of Yolanda C.'s Estate, has standing to recover for trading that occurred on the accounts after Yolanda C.'s death, since the accounts were in Andres' name only and the assets of the trusts into which the accounts were intended to be incorporated were to be distributed to Gloria and Yolanda M. upon Yolanda C.'s death.[28]  See Trust Agreement at arts. 8(B)(2), 9(A)(4).  To have standing, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."  Allen v. Wright, 468 U.S. 737, 751 (1984).  A plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  Warth v. Seldin, 422 U.S. 490, 499 (1975).  Since Yolanda C.'s interest in Andres' Schwab accounts terminated upon her death, her Estate does not have standing to seek recovery for trading that occurred after her death.  Therefore, any diminution in the value of Andres' accounts subsequent to Yolanda C.'s death is not recoverable by plaintiff, her executrix.

With respect to the trading that occurred during the brief interval between Andres' and Yolanda C.'s deaths, in order to ascertain what interest, if any, Yolanda C. had in Andres'

_____

[28]  Nor is it clear whether Gloria would have standing (had she brought the instant action in her individual capacity) to pursue claims related to Andres' accounts; in her Settlement Agreement with her sister Yolanda M., Gloria, without limitation, "waive[d] and release[d] any and all right, title and interest in and to the [Schwab] IRA," and "waive[d] and release[d] any and all right, title and interest in and to the ANDRES RODRIGUEZ Trust Agreement, as beneficiary or otherwise, except as specifically provided  [in the Settlement Agreement] . . . ."  Settlement Agreement at ¶¶ 3, 2 (Inquest Submission at Exh. K).

accounts during this time period, this Court directed plaintiff to show cause, "supported by citations to legal authority, why her claims should not be dismissed for . . . lack of standing." 11/22/04 Order at 2. From plaintiff's meager response it appears, at best, that, following Andres' death, Yolanda C. held a beneficial interest in the net income from the Residuary Trust (<u>see</u> Trust Agreement at art. 9(A)(1),(4)), the corpus of which consisted of those assets of the Trust Agreement and Andres' Estate that were not applied to the Primary Trust and that remained following the payment of estate taxes and debts. <u>See</u> <u>id.</u> at arts. 8(A), 9; Andres' Will at art. 3.[29] Yolanda C. survived her husband by only three weeks. Thus, any damages Yolanda C. may have suffered as a result of the unauthorized trading during the three weeks she outlived her husband are extremely limited or nonexistent. Even assuming that the trust income in which Yolanda C. held a beneficial interest was diminished by the unauthorized and excessive trading during the three weeks Yolanda C. outlived her husband, plaintiff has suggested no method by which this Court could calculate the diminution in trust income as a result of the trading. Under these circumstances, plaintiff has not satisfied this Court that Yolanda C.'s Estate suffered any damages from the trading that occurred on Andres' account between September 28, 2000 and October 18, 2000.[30]

---

[29] The Court has been presented with no indication that the trustee of the trusts ever exercised her discretion to distribute funds from either trust for Yolanda C.'s health, maintenance or well-being, and, even if such funds had been distributed, plaintiff has proffered no evidence that the unauthorized trading resulted in a reduction of this amount. There is also no evidence that Yolanda C. exercised her right, under the Residuary Trust, to seek an amount equal to the income on the IRAs and, at any rate, this option was exercisable only annually. <u>See</u> Trust Agreement at art. 9(A)(3).

[30] Since the unauthorized and excessive trading claims were brought against Mubanda, PF, *and* Charles Schwab, it is likely that any damages award against Mubanda and PF would have

(continued…)

The Settlement Agreement between Gloria and Yolanda M., in which the sisters agreed to assist each other in litigating this and another claim, does not alter this Court's conclusion that the Estate of Yolanda C. has a *de minimis* interest in Andres' accounts between the Rodriguezes' deaths and no interest in those accounts subsequent to Yolanda C.'s death. The Settlement Agreement does not purport to assign any interest in the instant litigation between the sisters, and, therefore, does not grant plaintiff standing to litigate claims for which Yolanda C.'s Estate has suffered no injury. A valid assignment of a claim must at least manifest an intention to transfer title or ownership in the subject matter. See Advanced Magnetics, Inc. v. Bayfront Partners, Inc., 106 F.3d 11, 17 (2d Cir. 1997). Here, while the Settlement Agreement provides for the distribution between the sisters of any damages award obtained as a result of this litigation (see Settlement Agreement at ¶ 4), nothing in the language of the agreement manifests Yolanda M.'s intent to transfer either her or Andres' Estate's interest in their claims against Mubanda and PF to either Gloria or Yolanda C.'s Estate. See Advanced Magnetics, 106 F.3d at 18 (holding that inclusion of an accounting provision in an agreement is insufficient to create an assignment in the absence of language showing intent to transfer all of the interest and title). Indeed, the Settlement Agreement is drafted such that Yolanda M.

---

[30](...continued)

to be reduced to take into account the amount, if any, recovered from Schwab as a result of the arbitration. See 15 U.S.C. § 78bb(a) ("[N]o person permitted to maintain a suit for damages under [the Securities Exchange Act of 1934] . . . shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of."); cf. Gould v. American-Hawaiian Steamship Co., 535 F.2d 761, 784 (3d Cir. 1976) (holding that amount received from settlement must be taken into account in computing damages judgment to be entered against non-settling defendants for violation of the Securities Exchange Act of 1934). Plaintiff has provided no information about the arbitration, its outcome or even whether it occurred.

could have brought the instant litigation instead of or with her sister, a right she would have forfeited had she transferred title to her claims. Finally, since there are a number of provisions in the Settlement Agreement that unambiguously transfer title to certain tangible and intangible property between the sisters (see Settlement Agreement at ¶¶ 1-3, 5-9), it is evident that, where the sisters intended an assignment, they were careful to make that intent clear.

### 5. *The Unauthorized Wire Transfers*

The only allegations in the Complaint in support of the tenth cause of action (the unauthorized wire transfer claim) are that plaintiff was damaged in the amount of $100,000 when Mubanda, for his own benefit and without authorization, "wired the sum of $60,000 to the Bank of New York into the account of a fictitious entity with a residential address of 588 Polly Park Road, Rye, New York, 10580" and "wired the sum of $40,000 to HSBC Bank into the account of a fictitious entity with a residential address of 588 Polly Park Road, Rye, New York, 10580." Compl. at ¶¶ 52-55. These wire transfers occurred, respectively, on or about August 11, 2000 and September 6, 2000. See id. at ¶¶ 52-53. These allegations fail to meet even the liberal notice pleading requirement of Rule 8 of the Federal Rules of Civil Procedure, which requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The statement "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).

Conspicuously absent from plaintiff's Complaint and Inquest Submission is any information identifying the account or accounts from which the alleged unauthorized wire

transfers originated. Despite references in the Inquest Submission to unauthorized wire transfers from Gloria's "parents' Charles Schwab account" (Gloria Aff. at ¶ 17), the account statements attached as Exhibit I to the Inquest Submission relate to only two accounts at Schwab, both of which are in Andres' name alone (see Inquest Submission at Exh. I).[31] Because plaintiff's entitlement to relief is contingent on the identity of the holder of the accounts from which the wire transfers originated,[32] plaintiff's failure to specify this information constitutes a fatal defect under Rule 8. Therefore, plaintiff is not entitled to a default judgment for the unauthorized wire transfers.[33]

### 6. Attorneys' Fees Request

Finally, plaintiff seeks an award of attorneys' fees.[34] Under this Court's analysis,

---

[31] Exhibit I reflects that on September 19, 2000, a $40,000 check was debited to Andres' Schwab One account. See September 2000 Schwab One Account Statement at 6 (Inquest Submission at Exh. I). The Schwab account statements do not show any wire transfers in August or September 2000.

[32] See supra pp. 28-31.

[33] Even if the Court were in a position to enter a default judgment against Mubanda for the unauthorized wire transfers, it would be unable to award damages on that claim as plaintiff has not submitted sufficient evidence to "ascertain the amount of damages with reasonable certainty." Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999). The only damages evidence plaintiff has submitted is contained in Gloria's affidavit, in which she discusses her discovery of the unauthorized wire transfers upon her review of her parents' accounts, but even this affidavit is inconsistent with respect to the amount of one of the wire transfers, which is variously alleged to be $60,000 and $80,000. See Gloria Aff. at ¶¶ 17-18. Moreover, as with the unauthorized trading claim, to the extent that the wire transfers originated from Andres' Schwab accounts, the Court has not been presented with information sufficient to ascertain how, if at all, Yolanda C. or her Estate were damaged by the transfers.

[34] See Inquest Submission at ¶ 34 ("The twelfth cause of action is for $20,000.00 in attorney's fees, and may be adjusted to represent an additional amount equalling one-third (1/3) of the total judgment on the substantive causes of action against the defendants.").

plaintiff is a prevailing party only with respect to the check forgery claims, which sound in conversion. New York follows the so-called American Rule, under which "attorneys' fees and disbursements are [considered] incidents of litigation and the prevailing party may not collect them from the loser unless an award is authorized by agreement between the parties or by statute or court rule." A.G. Ship Maint. Corp. v. Lezak, 511 N.Y.S.2d 216, 218 (N.Y. 1986). Plaintiff has neither alleged the existence of a contract providing for an award of attorneys' fees, nor pointed to any statute or court rule that would justify an award of fees to a party that prevails on a common law conversion claim. See Rinaudo v. City of Rochester, N.Y.S.2d 220, 220-21 (4th Dep't 1989) (reversing award of attorneys' fees in illegal entry and conversion action). With respect to any claims or theories of liability under which recovery is not warranted, plaintiff cannot be characterized as a prevailing party, a prerequisite to any fee award. Therefore, plaintiff's request for entry of a default judgment on her twelfth cause of action should be denied.

## C.     Damages: Conversion

As detailed above, the only viable claims in this case concern defendants' forgery of Andres' signature on the Merrill Lynch checks. The usual "measure of damages for conversion of a check is its face value," Deri v. Union Bank of Brooklyn, 120 N.Y.S. 813, 817 (N.Y. App. Term 1910), plus interest. See Fantis Foods, Inc. v. Standard Importing Co., 425 N.Y.S.2d 783, 786 (N.Y. 1980) ("The usual measure of damages for conversion is the value of the property at the time and place of conversion, plus interest."); see also Am. Fin. Servs., 2000 WL 815894, at *4 (third-party defendant's "brazen behavior [in committing conversion and fraud] has convinced this Court that the award of prejudgment interest is

justifiable.").

Having provided copies of the forged checks, plaintiff has substantiated her claim for damages in the amount of $80,000. Plaintiff concedes, however, that, since the check forgery claims against Mubanda and PF overlap with those against the settling defendants, Luther and Merrill Lynch, "any judgment received from the [defaulting] defendants . . . should simply be reduced by $40,000, the amount already received [in settlement]." Inquest Submission at ¶ 35. Therefore, as plaintiff suggests, the judgment against Mubanda and PF for the check forgeries should be reduced by $40,000.

With respect to prejudgment interest, the only reference in the record to interest of any kind appears in plaintiff's proposed order entitled "Default Judgment," in which she requests "interest at the legal rate in effect on the date of this judgment . . . ." [Proposed] Default Judgment at 2. New York sets prejudgment interest at a rate of nine percent per annum. See N.Y. C.P.L.R. § 5004 (McKinney 1992); Am. Fin. Servs., 2000 WL 815894, at *14 (awarding nine percent prejudgment interest in conversion case). Therefore, this Court recommends that plaintiff be awarded prejudgment interest calculated at an annual rate of nine percent.

## CONCLUSION

For the foregoing reasons, it is the recommendation of this Court that a default judgment be entered against Mubanda and PF on the first and second claims and that they be held liable, jointly and severally, for $40,000 in damages plus prejudgment interest at a rate of nine percent per annum. This Court further recommends that plaintiff's motion for a default judgment be denied with respect to all other claims and that those claims be dismissed.

Any objections to the recommendations contained in this Report and Recommendation must be filed with Judge Nina Gershon on or before <u>September 30, 2005</u>. Failure to file objections in a timely manner may waive a right to appeal the District Court order. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; <u>Small v. Sec'y of Health & Human Servs.</u>, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

The Clerk of the Court is directed to enter this Report and Recommendation into the ECF system and to mail copies to Mubanda and PF at their last known addresses:

> 85 Whiting Pond Road
> Fairfield, CT  06430
>
> 191 Post Road West
> Westport, CT  06880

**SO ORDERED.**

**Dated:** **Brooklyn, New York**
**September 20, 2005**

/s/
**ROANNE L. MANN**
**UNITED STATES MAGISTRATE JUDGE**